UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,              )<br>     Plaintiff,              )<br>            )<br>v.           )<br>            )<br>ALL PROPERTY IN/UNDERLYING )<br>E-GOLD ACCOUNT NUMBER:  )<br>3398013,          )<br>     Defendant.              )<br>_____) | Civil Action No. 07-01332 (RMC) |

### ERRATA

  Plaintiff hereby advises the Court and any claimants of the filing of the attached corrected "Affidavit In Support of Complaint for Forfeiture." Some of the discussion relevant to the defendant property in this case was omitted from the Affidavit filed when the Complaint was filed. As a result of the large number of contemporaneously-filed similar cases, the omission previously went unnoticed.

                  Respectfully submitted,

                  _/s/_____
                  JEFFREY A. TAYLOR
                  United States Attorney
                  DC Bar No. 498610

                  _/s/_____
                  WILLIAM R. COWDEN
                  DC Bar No. 426301
                  LAUREL LOOMIS RIMON
                  Assistant United States Attorneys
                  555 4th Street N.W.
                  Washington, DC 20530
                  (202) 514-7700

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**AFFIDAVIT IN SUPPORT OF COMPLAINT FOR FORFEITURE**
(18 U.S.C. §§ 981, 1957, 1960)

I, Roy Dotson, state as follows:

1. I am a Special Agent ("SA") of the United States Secret Service ("USSS"), and have been so employed for approximately three and one half years. I am currently assigned to the Orlando Field Office. Among my duties as an SA, I am charged with the investigation of financial crimes, including check fraud, identity fraud, credit card fraud, bank and wire fraud and the manufacturing, possession and passing of counterfeit United States currency. Prior to my employment with the USSS, I was employed by the Brevard County Sheriff's Office for nine years. My last assignment was that of a Federal Task Force Agent with the Drug Enforcement Administration. Among my duties as a Task Force Agent, I was charged with investigating large criminal organizations that distributed and sold controlled substances and financial crimes involving money laundering. Several of the investigations resulted in the seizures of criminally derived property, including, but not limited to, monetary instruments.

2. An investigation into the E-GOLD operation is being conducted jointly by the United States Secret Service, the Federal Bureau of Investigation, and the Internal Revenue Service. Information obtained as a result of the investigative efforts of each agency are being shared with agents from the other agency and have been incorporated into this affidavit. The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other law enforcement officers; review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and

circumstances described herein; and information gained through my training and experience and the training and experience of others.

3.  This affidavit is being submitted in support of a verified Complaint for Forfeiture *In Rem* against property seized from in the E-GOLD accounts listed below, all of which constitutes property involved in money laundering and the operation of an unlicensed money transmitting business, and thus is subject to forfeiture based upon 18 U.S.C. § 981(a)(1)(a), and is further property traceable to proceeds of "specified unlawful activity," and thus is subject to forfeiture based on 18 U.S.C. § 981(a)(1)©. The E-GOLD accounts listed below contain property that falls into one of three categories: (1) property involved in laundering the proceeds of child pornography; (2) property involved in laundering the proceeds of credit card fraud; and (3) property involved in laundering the proceeds of wire (investment) fraud. All of these accounts contain the digital currency "e-gold" that is allocated and transferred among accounts by e-gold, Ltd. The physical precious metals that are "backing" the e-gold are controlled by the E-GOLD operation and by Douglas Jackson and Barry Downey. The specific property is:

a.  Property involved laundering the proceeds of wire (investment) fraud:

| Name | Account number |
|---|---|
| **FSI SRL Powerclub** | 3398013 |

4.  Based upon the evidence uncovered, there is reasonable cause to believe that the property contained in the above- identified E-GOLD accounts is involved in money laundering in violation of Title 18, United States Code, Section 1956, and is therefore subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), or is identical property found in the same place or account, within one year, as the property involved in the offense giving rise to forfeiture, and

therefore subject to seizure for forfeiture as provided by 18 U.S.C. § 984(a)(2), or property involved in a money laundering conspiracy, or involved in the operation of an unlicensed money transmitting business.

5.    The transactions occurring in, and the total value of, the accounts described in this Affidavit for seizure are presented below in both grams of gold and U.S. dollars to reflect the way in which the owners and operators of the e-gold system record the transactions occurring in the e-gold accounts in their databases, as discussed more fully in paragraphs 18 and 19. To obtain the value subject to seizure in these accounts pursuant to the requested seizure warrant, it will be necessary to require e-gold, Ltd. and/or Gold & Silver Reserve, Inc. to convert the "e-gold" in the accounts specified to United States dollars or physical precious metals before turning the property over to the United States. Otherwise, the property in the accounts will remain as e-gold and thus entirely under the unsupervised control of e-gold, Ltd. and Gold & Silver Reserve, Inc. (defendants in the related criminal case), could be easily dissipated, and would be essentially without value should e-gold, Ltd. and or Gold & Silver Reserve, Inc., and other exchangers decide not to provide exchange services. Further, given that the United States is seeking the seizure of the e-gold accounts of some of those entities, exchange services may be partially, if not entirely unavailable after the seizure warrants are executed.

6.    I have not included every detail of every aspect of the investigation for this affidavit. Rather, it only includes the information necessary to establish that reasonable cause exists to believe that the defendant property is subject to forfeiture.

### *Background on Digital Currency Issuers and Exchangers*

7.    A "digital currency" is a medium of exchange offered over the Internet that is

purportedly backed by precious metals and offers users another option for conducting on-line funds transfers. Digital currencies are generally marketed as offering global acceptance without the need for conversion between national currencies, and are valued at fluctuating rates tied to the price of a particular precious metal, especially gold. Digital currency is used for on-line commerce or for funds transfers between individuals for private purposes. While technically speaking, the owner of digital currency could have some right to acquire the actual metal behind the currency, digital currency users typically convert their value into a national currency when they want to take value out of the on-line system.

8.       One of the earliest issuers of digital currency was e-gold, Ltd. ("E-GOLD"), which operates via the Internet using the domain name www.e-gold.com, and began offering the digital currency "e-gold" in 1996. E-GOLD appears as the most popular and prominent digital currency available on-line. e-gold is widely accepted as a payment mechanism for transactions involving credit card and identification fraud, high yield investment programs and other investment scams, and child exploitation. e-gold is not widely accepted by large or mainstream vendors.

9.       There are four primary steps involved in a financial transaction using e-gold: (i) opening a digital currency account with E-GOLD; (ii) converting national currency into e-gold to fund the account; (iii) using e-gold to buy or sell a good or service or transfer funds to another person; and (iv) exchanging the e-gold back into national currency. E-GOLD needs two additional parties to complete these steps: (i) digital currency exchangers; and (ii) merchants or individuals that are willing to accept e-gold for the payment of goods and services or to use the e-gold operation to transfer funds.

10. Digital currency exchangers take national currency from customers and exchange it into e-gold for purposes of funding a new E-GOLD account, or increasing the value of an existing account.

11. Exchangers also exchange e-gold back into national currency and are typically the only method by which users can obtain the value out of an E-GOLD account, short of taking possession of the precious metal itself, which is not always possible and practically never done. Each exchanger set its own terms and conditions on the types and amounts of national currency that it accepts for exchange. Some only accept transfers from banks or credit card accounts. Others accept cash and money orders. Most exchangers (including all of the domestic exchangers investigated) operate out of their home by using an Internet website to service customers, bank accounts for accepting cash and other deposits, and post office boxes for receipt of checks and other mailings.

12. The exchangers are an integral part of the e-gold operation. Some of these exchangers are sponsored by E-GOLD on its website and receive discounted rates for the e-gold they purchase to operate their businesses. While, generally, these exchangers also convert national currency to other online digital currencies, e-gold is the most prominent and extensively-used digital currency.

13. Individuals using digital currency exchangers typically incur fees on a per transaction basis. Fees/percentages incurred per transaction depend largely on the exchanger used. In some instances, the exchanger would charge up to 6% of the amount of funds transferred. These fees assessed by the exchanger are referred to as "service fees."

14. Users around the world can register for a free E-GOLD account via the E-GOLD

website and fund their account through a third party digital currency exchanger or through E-GOLD's own exchange service, which it called "OmniPay." Once open and funded, account holders can access their accounts through the Internet and conduct transactions with other parties anywhere in the world. E-GOLD advertises on its website that it is "an alternative Internet payment system" that "empowers people to use gold as money." E-GOLD advertises its service as "Better Money," and "Internet Payments 100% backed by Gold."

15.     The digital currency e-gold can be traded among online account holders using the Internet. With only a valid e-mail address, each account holder is issued an e-gold account, which can be used to send and receive any amount of e-gold to/from other e-gold account holders anywhere in the world anonymously, instantaneously, and irreversibly. E-GOLD, in combination with other unregistered money service businesses, has become a preferred funds transfer mechanism for a multitude of criminal financial transactions.

### *The E-Gold Operation*

16.     The e-gold operation consists of two entities, e-gold, Ltd. ("E-GOLD") and Gold & Silver Reserve, Inc. ("GSR"), and three individuals, Douglas Jackson, Barry Downey, and Reid Jackson (collectively the "e-gold operation"). As described above, E-GOLD is the issuer of the digital currency known as "e-gold," which functions as an alternative payment system, is purportedly backed by stored physical gold, and operates via the Internet using the domain name www.e-gold.com. GSR describes itself as the operator of E-GOLD and its respective website, and offers a digital currency exchange service (known as OmniPay) for individuals wishing to purchase, transfer, and/or sell e-gold. OmniPay operates via the Internet using the domain name www.omnipay.com. While E-GOLD was incorporated in Nevis, the e-gold operation is located

entirely in Florida, including its physical business location at 175 E. Nasa Blvd., Suite 300, Melbourne, Florida (including management, employees, and records) and computer servers that conduct its on-line operations. All e-gold transactions take place through the e-gold server and database located in Florida. All e-gold accounts and balances are maintained there as well. The e-gold operation's owners/operators include Douglas Jackson, Barry Downey, and Reid Jackson.

      17.     <u>Ownership of e-gold</u>. According to the e-gold website, the gold bullion allegedly backing the digital currency e-gold is physically held in allocated storage in overseas vaults by three repositories (*i.e.*, custodians) on behalf of the e-gold Bullion Reserve Special Purpose Trust. Also according to the e-gold website, the e-gold Bullion Reserve Special Purpose Trust was established for holding title for the gold collectively on behalf of the e-gold account holders. The e-gold Account User Agreement provides that an "e-metal balance is accounted by weight and constitutes title to that precise fine weight of metal." As such, the beneficiaries of the e-gold Bullion Reserve Special Purpose Trust are purportedly the account holders of e-gold accounts (collectively) and e-gold account holders purportedly hold title to the "precise fine weight of metal" backing the amount of e-gold in their account. However, the account holders' right to claim the physical gold in exchange for their e-gold is severely circumscribed by the user agreement's conditional right of redemption, which provides, among other things, that the minimum quantity for redemption would "in no case ... be less than the fine weight of the smallest bullion items held in storage." According to the e-gold website, E-GOLD's lowest ounce bar is a 32 ounce bar, worth approximately $21,248. As a result, at a minimum, an account holder can only exchange $21,248 worth of e-gold in order to take physical possession of the gold. Finally, the e-gold website also provides that "[N]o metal may be removed from

storage or any other disposition made without the signatures of both e-gold Ltd. and a third party Escrow Agent of good reputation." This further conditions an e-gold account holder's ability to obtain physical possession of any gold.

### *Examination of E-GOLD Customer Account Database*

18.     Search warrants were conducted on the business location of the e-gold operation as well as the location of the operation's computer servers in December of 2005. Approximately three terabytes of digital evidence (three quadrillion characters of information) and 100 boxes of documentary evidence (approximately 288,000 pages) were seized.

19.     Evidence regarding the transactions and account activity of e-gold account holders and its customers was obtained through examination the e-gold operation's computer databases. The e-gold operation maintains Microsoft SQL server databases housing customer profiles and transaction histories of e-gold account holders, as well as OmniPay customers. Your Affiant obtained copies of these databases by imaging servers located at AT&T in Orlando, Florida[1] and seizing back-up tapes at the Melbourne offices of the e-gold operation pursuant to a December 16, 2005 search warrant issued by a Magistrate Judge in Orlando, Florida. The e-gold operation also provided an additional update of the database information (by copying the database to hard drives) for the period of November 2005 through October 2006 in response to grand jury subpoenas issued on May 22, 2006 and October 25, 2006. The e-gold operation provided a second update of the database information (by copying the database to an external hard drive) for the period of October 2006 through March 2007 in response to a grand jury subpoena issued on

---

[1] Both the e-gold and OmniPay websites and corresponding customer databases are run from servers co-located at AT&T in Orlando, Florida, approximately 100 miles from GSR's physical business location in Melbourne, Florida.

March 6, 2007.

    20.    From these images of the servers and copies of the databases, I was able to reconstruct the customer profiles and transaction histories for e-gold account holders by transferring the database information on each account holder into a Microsoft Excel spreadsheet. The following specific information was available for each e-gold account:

    a.    <u>Customer profile</u>:  point of contact information for the e-gold account holder, including account name, mailing address, and email address supplied by the customer.

    b.    <u>Transaction history</u>:  list of transactions demonstrating e-gold being transferred into and out of the account.  For each transaction, the history contains, among other things, the date of the transaction, the type of transaction (e.g., whether e-gold is being transferred into or out of the account), the e-gold account number of the other party to the transaction (also known as the "counteraccount"), the amount of the transaction, the Internet Protocol (IP) address of the transferor of e-gold, and a place for the customer to make a notation about the purpose of the transaction (also known as the "memo" field).

    c.    <u>Value limits</u>: The e-gold operation had a policy of placing a "value-limit" on accounts that it believed to be engaged in criminal activity or where bogus contact information had been entered by the account holder.  An account holder with a "value limit" placed on his or her account was restricted from receiving any further e-gold into his or her account, although s/he continued to be free to spend or transfer any e-gold out of his or her account.  When a "value-limit" was placed

on an account, a notation of the basis for the "value-limit" (such as for "child porn," "scammer," or "cc fraud") was entered in the user's account profile in the e-gold database and would appear, along with the date the value limit was placed, in the transaction history information.

21. From these images of the servers and copies of the databases I was able to perform various searches of the database, including, for example:

  a. Searches for particular terms used in the "memo" fields in the customer transaction histories, such as "lolita," "IDs" or "HYIP" to indicate that "e-gold" was being used for the purchase and sale of contraband or otherwise used for criminal purposes.

  b. Searches for particular e-mail addresses of known criminals or criminal entities that may have been used to create an e-gold account.

  c. Searches for particular names or nicknames of known criminals or criminal entities that may have been used to create an e-gold account.

  e. Searches for notations of the basis for the e-gold operation placing "value-limits" on particular accounts, such as for "child porn," "scammer," or "cc fraud".

### *Wire Fraud (Investment Scams)*

### **Background on Pyramid Schemes**

22. E-GOLD has been a highly-favored method of payment by operators of investment scams, which generally refers to pyramids, ponzis, HYIPs (*i.e.*, high-yield investment programs) and other "get-rich-quick" schemes. During the course of this investigation, I consulted with an Economist at the Federal Trade Commission (FTC) who explained that a

pyramid (or ponzi or HYIP) scheme is an organization in which the participants obtain their monetary benefits primarily from the recruitment of newer participants, rather than from the sale of goods and/or services to the general public. Because of this, the overwhelming majority of the participants cannot expect to make any money from their participation. A small minority of participants, namely those who participate at the very beginning, might make money. However, because of the nature of the pyramid scheme, those who make any money must of necessity be only a small minority of all participants.

23.  The FTC Economist further explained that growth of the system does not change the fact that the large majority of participants at any point in time will have lost money. An individual participant might go from having a net loss to a net profit as the system grows, but it must be true that the majority of participants will lose money. The system cannot grow indefinitely, if for no other reason than the fact that growth is limited by the finite human population of the earth. Long before this point is reached though, the number of people willing to pay to sign on as new participants will become fewer and fewer. At this point, no further growth is possible, and the scheme will collapse. When that happens, the majority of the participants will have lost money.

24.  The FTC Economist further explained that these scams typically have one of several indicators or "markings," including (i) the promise of abnormally high short-term returns on investments; (ii) the absence of any legitimate or reasonable business investment; and (iii), as described above, only a small minority of individuals can profit from the operation of the business.

25.  According to Omar Dhanani, an individual convicted of access device fraud in the

above-described Shadowcrew prosecution, who also used e-gold to participate in pyramid schemes, e-gold has been favored in this area particularly because of a user's ability to operate accounts anonymously, and e-gold's policy of making all transfers of e-gold irrevocable and not subject to reversal.

      26.    A search of the e-gold database revealed over 11, 000 e-gold accounts that have been opened using the term "hyip" in either the account-owner's name or e-mail address, or where "hyip" appears in the "memo" field of the transaction record.

Patterns of Investment Scams using e-gold

      27.    This investigation uncovered numerous promoters (or operators) of pyramid, HYIP, and other similar schemes, each of whom operated several different investment scams and laundered their proceeds through chains of interconnected e-gold accounts. Several patterns emerged with regard to the transaction activity within accounts operated by these promoters. First, the promoters would set up an e-gold account to which all investors would send deposits to the program. From this main account, the promoters would pay out three types of "returns": (1) payouts to a majority of investors in amounts much smaller than the investors' initial deposits in order that these investors would keep believing this was a worthwhile "investment"; (2) payouts to a select group of investors in amounts far exceeding their initial investment in order that these investors could continue to promote the scheme as actually paying out the "promised return"; and (3) transfers to e-gold accounts controlled by the same promoter in large amounts representing the profits of the scam (*i.e.*, the stealing of investors' money).

      28.    The promoters of the large pyramid (or HYIP) schemes appeared to coordinate their activity informally by investing in, and thereby promoting, the other promoters' programs.

This informal coordination allows the promoters to ensure that they will become the select group of investors receiving the "promised return" from any given scam. Such investments in other large HYIP programs also enables promoters to mask their profits from the original scam by layering the scammed funds through many different e-gold accounts. Once filtered through several layers of transactions and accounts, HYIP promoters typically store their funds in a holding account, waiting for the opportunity to exchange the funds into national currency.

29.     Because most of the High Yield Investment Scams are promoted, operated, and maintained on the Internet, most of the communication among the operators and participants is conducted within on-line virtual discussion groups. Discussion groups are places for individuals to place a "post" on a web board for others to read and to reply to. www.TalkGold.com, www.HYIPdiscussion.com, and other discussion boards provide information outlining the programs that are currently operating and other pyramid schemes that have collapsed on themselves. Most of the individual posts to the boards are from those who invest in the pyramid schemes and those who operate and promote the illegal investment scams.

Pyramid Terms in "Memo" Fields

30.     This investigation also revealed that e-gold accounts involved in the operation of pyramid schemes and HYIPs use certain terms in the memo fields of transaction records that identify a particular scheme in progress. Such terms include "%gains," "refund," "payout," "units," "loans," "contracts," and "compounding." Use of these terms are indicative of deposits to, and payouts from, a pyramid scheme or HYIP.

**Identified e-gold accounts operating pyramid schemes**

**FSI SRL Powerclub**
**e-gold account 3398013**

31.     e-gold account number 3398013 (in the name of F.S.I. Srl) contains proceeds of an illegal pyramid scheme known Powerclub, whose operators (Future Strategies Srl a/k/a Future Strategies International ("FSI")) were the subject of an Securities and Exchange Commission ("SEC") suit for operating an illegal pyramid scheme known as "Pentagono" (Civil Action No. 1:99-CV-1199-JTC, Northern District of Georgia).  The contact information for e-gold account 3398013 is Alessio Zito Rossi, via A. Moro, 18, Carpi, MO, Italy 4102; alessio.zito@future.it, +39 059 699 800.  This address is also found on www.Power-Club.net and www.supremacard.com, both which show a copyright "© 1994-2006 by F.S.I. - All rights reserved."  FSI Srl's company website is www.future.it, which includes all of its marketing programs, including the "Pentagono" scam.  According to the SEC complaint, the Pentagono scam was based upon the claim that an investor can earn up to $116,400 from an investment of approximately $120 (by the purchase of "certificates" or "card purchase orders" ("CPOs")). According to the SEC press release,

> The complaint alleges that the Pentagono scheme involves the offer and sale of Pentagono Certificates/CPOs by Future Strategies through existing participants. Each new investor makes a payment to Future Strategies, as well as to the person purportedly offering the Certificate/CPO and to a person who had previously purchased Certificates/CPOs. Upon payment, Future Strategies provides the new investor with three new Certificates to sell. The investor then becomes eligible to receive a portion of the proceeds raised from the sale of subsequent Certificates/CPOs.

Following the SEC complaint, FSI Srl began operating a new scheme called "Powerclub" via the Internet at www.Power-Club.net, which is similar in nature and form to the "Pentagono" scheme.

In the Powerclub scheme, investors purchase CPOs with an initial investment of $50 which, in turn, are sold to additional investors for the purchase of a "Suprema Card." According to a member of the Powerclub scheme reporting on a website devoted to multi-level marketing programs, the Powerclub system "is programmed to make every member get until 87,480.00 Euros ($118,676.99)." That member also reports how the system works:

> Your friend has a Certificate with the names of seven people printed on it. Every Certificate issued is serial numbered and guarantees the upline structure to its subsidiary participants. As you will see, the person in 7th position is your friend and the one in Top Position is written in a larger print together with is or her full name and address and/or bank details. To join Power Club, you simply need to take a Certificate and then distribute the commissions in three parts as follows:
>
> Transfer or send a bank draft of 40 Euros directly to the person in Top Position, as a network commission. Give 40 Euros to your friend in 7th position, as a direct sales commission. Send 40 Euros to F.S.I. Srl following easy payment instruction to cover administration costs (card issue, faxing, mailing, data processing, etc). The payment can also be accepted in US Dollars for the equivalent of 40 Euros (at today's exchange rate). Then fill out the Certificate with your details and send it together with the proof of payment to F.S.I. Srl by airmail, fax or email. This application will then be processed and 3 new Certificates will be issued immediately and sent to you. On these Certificates your name will appear in 7th position and as a result of this, the other names from the previous Certificate have moved up one position. The person who was in Top Position earned network commissions from this sector of the network ... By introducing just 3 new people into the network you receive 40 Euros in cash immediately from each one and already your initial outlay is recovered. As each person downline from yourself receives their 3 certificates, your name will then appear in 6th position 9 times. By this stage your network has already begun its exponential growth and this can happen in less than 24 hours!

32.     During the course of this investigation, I consulted with an Economist at the

Federal Trade Commission (FTC) with expertise in pyramid schemes who confirmed, after examining the Pentagono scheme and the Powerclub website, that both programs appear to be illegal pyramid schemes because, among other factors, "it must always be the case that the majority of participants will lose money, no matter how big the scheme gets."

33.     All proceeds in e-gold account 3398013 were derived from investor deposits. An analysis of e-gold account 3398013 revealed that activity began in the account in July 2006 and continues through March 13, 2007. All incoming transactions have memo fields similar to "ACTIVATION CERTIFICAT N° 608165024S/01" for amounts of generally $50.00 (or increments thereof). There were 15,345 transactions into the account totaling 477.224076 grams ($910,516.07). There were 112 transactions out of the account, including 12 exchanges to national currency through IceGold, totaling 635.666424 gold grams ($395,336.49), and the remaining outgoing transactions, which totaled 71.28224 gold grams ($35,007.62) and contained memo fields of "POWERCLUB - Unipayment" or "POWERCLUB refund," appear to be customer payouts to keep the scheme running. As of April 30, 2007, e-gold account 3398013 contained 916.215791 grams ($621,194.34) of illegal pyramid scheme proceeds.

I, Roy Dotson, a Special Agent with the United States Secret Service, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Affidavit is based upon reports and information known to me and/or furnished to me by law enforcement agents, and that everything represented herein is true and correct to the best of my knowledge and belief.

Executed on this  16th  day of October, 2007.

/s/
_____
Roy Dotson
Special Agent, USSS